UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GINETTA BYNUM, individually and as Administrator of the Estate of DAVID BLAKENEY,<br><br>     Plaintiff,<br><br> -against-<br><br>THE UNITED STATES OF AMERICA; JOHN ROE #1 (USP CANAAN WARDEN); JOHN ROE #2 (BOP REGIONAL DIRECTOR); JOHN DOES #1-10<br><br>    Defendants. | No.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Ginetta Bynum by and through her attorneys Kairys, Rudovsky, Messing, Feinberg & Lin LLP, Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, Kaufman Lieb Lebowitz & Frick LLP, and Levy Firestone Muse, alleges as follows:

## INTRODUCTION

1. David Blakeney was a young man with serious mental illness and physical health difficulties. Though he was sentenced to serve time in prison, he was not sentenced to die there. But that's what happened when staff at United States Penitentiary Canaan ("USP Canaan"), a Federal Bureau of Prisons ("BOP") facility in Pennsylvania, ignored and then exacerbated his rapidly deteriorating physical and psychological health and disregarded his repeated complaints of pain—leading to his tragic death at the age of 32 from an easily treatable, highly preventable ulcer.

2. For weeks, Mr. Blakeney complained to BOP staff of persistent and unrelenting abdominal and rectal pain, but BOP staff did nothing to diagnose or treat him. Instead, they prescribed him high-dose Ibuprofen—a medication that every

reasonable medical provider knows can cause or worsen ulcers—and denied him even basic diagnostic care.

3.     When Mr. Blakeney exhibited signs and symptoms of his mental health issues in early May, USP Canaan staff responded not with appropriate intervention but rather with repeated use of excessive force and prolonged restraint amounting to torture. Instead of treating his conditions, they repeatedly pepper-sprayed him, sent him to solitary confinement, punched and kicked him, and left him in dehumanizing and painful restraints—all of which exacerbated the ulcer and prevented him from getting the medical care that would have saved his life.

4.     Even as Mr. Blakeney's condition worsened, BOP staff responded not with compassion or care but with brutality: they chained him in four-point hard restraints—with each wrist and ankle shackled to a bed, leaving him spread-eagle and unable to move—for nearly *two straight weeks* without medical justification and without adequate monitoring of his rapidly deteriorating physical condition and medical symptoms.

5.     In the weeks leading up to his death, including the many days he spent completely restrained, Mr. Blakeney displayed unmistakable signs of profound physical distress—including edema (swelling) in his hands and feet, persistent tachycardia (elevated heartrate), bleeding from his rectum, massive and sudden weight loss, and visible wounds from the restraints that were noted to be infected—along with extreme psychological distress and mental decompensation. Yet BOP prison staff ignored these obvious symptoms and instead subjected Mr. Blakeney to further excessive force, including pepper-spraying and assaulting him.

6.    On May 15, 2023—just one week before Mr. Blakeney's death—a consulting medical doctor recommended to BOP staff that Mr. Blakeney be emergency transferred to an outside facility where he could be "closely monitored in an inpatient hospital center with medical staff." The doctor further warned: "It is imperative that both the Medical and Psychology departments of your institution work together for the continued improvement of the patient." But USP Canaan staff and BOP regional leadership took no action. Instead, they left Mr. Blakeney confined and ignored, without any appropriate medical intervention.

7.    A week later, in the early morning of May 23, 2023, Mr. Blakeney was found dead in his cell. He was just 32 years old. The autopsy determined he died from a gastrointestinal hemorrhage caused by an untreated ulcer—an easily preventable death.

8.    The United States is liable for its employees' total failure to provide even the most basic care and their deliberate indifference to Mr. Blakeney's serious medical and mental health needs, as well as their use of illegal excessive force against him, which directly caused his preventable suffering and death.

## PARTIES

9.    Plaintiff Ginetta Bynum is the Administrator of the Estate of David Blakeney. She is Mr. Blakeney's mother. She resides in District Heights, Maryland. She works as a school bus driver for children with special needs.

10.    Defendant United States of America is liable under the Federal Tort Claims Act for the injuries caused by the conduct of its employees and/or agents, including but not limited to the individual defendants named herein.

11.    Defendant John Roe #1 served at all times relevant to the allegations in this Complaint as the Warden of USP Canaan, a BOP facility in Wayne County,

Pennsylvania. He/she is sued in their individual capacity. At all times relevant to this complaint, Defendant Roe #1 was acting within the scope of their employment. Despite diligent efforts, Plaintiff has not been able to ascertain John Roe #1's name.

12.     Defendant John Roe #2 served at all times relevant to the allegations in this Complaint as the BOP's Regional Medical Director for the Northeast Region, which includes Pennsylvania. He/she is sued in their individual capacity. At all times relevant to this complaint, Defendant Roe #2 was acting within the scope of their employment. Despite diligent efforts, Plaintiff has not been able to ascertain John Roe #2's name.

13.     John Does #1-10 were correctional officers and/or medical personnel at USP Canaan. At all relevant times, John Does #1-10 worked as employees, agents, and/or contractors of the BOP and were acting in the scope of their employment.

## JURISDICTION AND VENUE

14.     This action arises under the United States Constitution and the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*

15.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1346(b)(1).

16.     Venue lies in the Middle District of Pennsylvania under 28 U.S.C. §§ 1391(b)(2) and 1402(b) because a substantial part of the acts and omissions giving rise to this claim occurred in this District.

17.     Ms. Bynum presented a claim on behalf of Mr. Blakeney's Estate and a claim on behalf of herself to BOP on or about November 14, 2024, both of which were denied on March 6, 2025.

## JURY DEMAND

18.     Plaintiff demands a trial by jury on all claims triable by jury, in particular, his Eighth Amendment claim brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## FACTUAL ALLEGATIONS

### *David Blakeney*

19.     David Blakeney grew up in Washington, D.C., with his mother and father.

20.     He has a daughter, A.M.B., who recently turned eight years old.

21.     When he was a teenager, Mr. Blakeney developed serious mental illnesses that his family struggled to help him manage.

22.     In 2011, Mr. Blakeney began receiving treatment at the Psychiatric Institute of Washington (PIW) after he began to experience an increase in hallucinations and delusions.  He was eventually diagnosed with bipolar disorder and schizophrenia. Mr. Blakeney also suffered from drug addiction.

23.     His parents repeatedly sought help for his mental illness. He was treated at several facilities including DC's Comprehensive Psychiatric Emergency Program.

24.     In 2017, when Mr. Blakeney was in his late 20s, he was arrested and sentenced to prison.

25.     The sentencing judge recommended that Mr. Blakeney serve his sentence at the Federal Medical Center Butner ("Butner"), in North Carolina, which houses individuals with serious health issues and medical needs.

26.     But Mr. Blakeney was never sent to Butner. Because he was a D.C. resident, he served time in several BOP facilities, first at USP Allenwood, then USP Thomson, and then at USP Canaan, where he was transferred in late 2022.

27.     At USP Canaan, he was prescribed a number of medications to treat his mental health, including Sertraline, Trazodone, and Aripiprazole.

### USP Canaan

28.     USP Canaan is a high-security federal prison in Waymart, Pennsylvania. As of August 2022, approximately 1200 incarcerated men lived there.

29.     The facility's medical care is rated as Level 2 by the BOP, meaning it can house people who may require regular clinician evaluation, such as to manage long-term conditions, but are generally stable.

30.     In August 2022, when the District of Columbia Corrections Information Council (CIC) inspected the facility, USP Canaan had 32 staff vacancies, including the medical director and clinical director.[1]

31.     A significant number of D.C. residents incarcerated at USP Canaan reported to the CIC that they did not receive timely medical attention from staff.[2]

32.     One third of the D.C. residents incarcerated at USP Canaan whom the CIC interviewed reported that they did not receive their mental health medications consistently.[3]

33.     Residents stated that medical services are "generally unresponsive." Several residents reported that staff throw out sick call slips and grievance forms.[4]

---

[1] USP Canaan, Report on Findings and Recommendations, District of Columbia Corrections Information Council (Jan. 5, 2023), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/CIC_USP%20Canaan%20Inspection%20Report.pdf.
[2] *Id.* at 7.
[3] *Id.* at 8.
[4] *Id.* at 10.

34.    A large number of D.C. residents contacted by the CIC reported that they felt "extremely unsafe" at USP Canaan.[5]

35.    According to data from the BOP, 25 inmates have died at USP Canaan between November 2008 and May 2023. One of these individuals, James Spratley, died at USP Canaan on May 28, 2023—within one week of Mr. Blakeney's death. He suffered from Type 2 diabetes and reportedly died of heart disease at only 44 years old.

36.    On December 30, 2024, Terry Flowers was found unresponsive only hours after he was placed in a holding cell for allegedly being disruptive to USP Canaan staff. Mr. Flowers, who was only 36 years old, was pronounced dead at Wayne Memorial Hospital that night.

37.    Wayne Memorial Hospital is approximately 15 minutes away; the nearest trauma unit is about 20 minutes away. BOP staff were able to transfer people incarcerated at USP Canaan to these facilities for emergency and outpatient care.

### *Ulcers Are Typically Not Life-Threatening*

38.    Ulcers are commonly caused by taking high doses of nonsteroidal anti-inflammatory drugs like Ibuprofen.

39.    Physical and emotional stress—like being chained to a bed for days—can also cause and exacerbate ulcers.

40.    Ulcers are treatable. An endoscopy through the patient's throat can diagnose the ulcer and cauterize it, if necessary. Often, the only treatment required is medication, specifically a proton-pump inhibitor (PPI) to suppress gastric acid

---

[5] *Id.*

production and promote healing of the ulcer. PPIs are inexpensive, safe, widely available, and highly effective at treating ulcers when administered in a timely manner.

41.     If an ulcer is not treated it can erode deeper into the gastrointestinal tract, which can lead to perforation of the duodenum (the first part of the small intestine) and/or erosion into the blood vessels, which can cause massive gastrointestinal bleeding. Both perforation and hemorrhage are medical emergencies that can result in severe complications and death if not promptly diagnosed and treated.

### Mr. Blakeney's Abdominal Pain Is Ignored

42.     Mr. Blakeney arrived at USP Cannan on or around November 2, 2022.

43.     At his intake screening at the facility, he reported no serious physical health issues and appeared normal, cooperative, and alert.

44.     In addition to regular medication to manage his schizophrenia, in November 2022, USP Canaan officials prescribed him an 800mg dose of Ibuprofen to take three times a day, totaling 2400mg a day, for ten days due to pain from impacted teeth.

45.     Over the next few weeks, Mr. Blakeny repeatedly complained of abdominal pain over his umbilicus (the belly button) and of discomfort and cramping in his abdomen that was not associated with eating. He rated the pain a 7 out of 10.

46.     Medical staff noted soft tenderness in his mid-abdomen. But Mr. Blakeney was instructed only to get over-the-counter (OTC) medicine for his abdominal pain.

47.     Staff noted that, if his symptoms did not improve, they would order an abdominal ultrasound or CT scan. But though Mr. Blakeney remained in pain, no such imaging was ever ordered or performed.

48.     In February 2023, the pain returned.

49.     In a message to his mother, Mr. Blakeney said he was "in the worst pain ever" and that the pain was "ridiculous."

50.     He reported to BOP staff that he had been having this pain "for some time" and that it was getting worse.

51.     Though BOP medical personnel told Mr. Blakeney he likely had hemorrhoids, no BOP staff performed a physical or visual examination to confirm this diagnosis.

52.     On February 17, 2023, Mr. Blakeney told his mother, they "gave me nothing for it," again repeating that he was in "serious pain."

2/17/2023 12:35:17 PM

:( Mom I'm in the worst pain ever they just told me I have hemroids and gave me nothing for it Smh This is some serious pain :(

2/17/2023 7:02:44 PM

Ok mom and yea this stuff is ridiculous painful mom Smh <3 I love you mom always <3

*Figure 1*

53.     Medical staff told Mr. Blakeney to purchase hemorrhoid ointment and witch hazel from commissary. He told his mother he would try to buy those materials. BOP medical staff also prescribed him 600mg of Ibuprofen to be taken four times daily, 2400mg a day, for a week.

54.     Still, five days later, he remained in "crucial pain."

2/21/2023 9:51:03 AM

<3 Goodmorning Mom <3 I love and miss you soo much :) I received what you sent me as well. I'm trying my best to hang in there. I must admit I'm in crucial pain Smh I suppose to make it to commissary today hopefully :) How are you feeling I hope bless and not stress <3 I love you Mom always <3

*Figure 2*

55.    Despite Mr. Blakeney's use of the over-the-counter products BOP staff told him to purchase, his excruciating pain persisted.

56.    On March 1, he asked his mom and his aunt how long it normally takes for hemorrhoids to clear up, because he was still "so uncomfortable."

57.    Mr. Blakeney sought medical care again on March 2, but BOP staff merely told him only to keep using the products he had been using for nearly two weeks and suggested he may need future surgery. BOP staff still did not perform any examination or diagnostic testing.

58.    The next day, Mr. Blakeney told his mother he was still experiencing "vicious pain": "Every time I think it's about over with a viscous [*sic*] pain shoot through my rectum to let me know it's far from over Smh I'm doing my best to deal with this stuff."

59.    On March 4, he wrote again: "The pain just won't leave and these people don't care honestly." His mother responded that his pain may not be hemorrhoids because pain from hemorrhoids should not last so long. She urged him to try to ask medical staff for treatment.

60.    Mr. Blakeney wrote to his aunt a few days later: "I'm about to go complain to them right now. I'm still in pain and it's so discomforting."

61.    Mr. Blakeney returned to the clinic on March 8.  During that visit, he reported three weeks of rectal pain and burning and rated his pain a level 4 out of 10, according to the record taken by BOP staff. He also reported to staff that he had been self-treating for weeks with laxatives and hemorrhoid cream from the commissary without improvement.

62.    Despite weeks of ongoing pain and persistent symptoms, John Doe staff failed to perform even a basic physical examination to confirm whether hemorrhoids were present, nor did they order any other diagnostic tests to determine the cause of his weeks-long pain.

63.    Instead, John Doe staff again prescribed Mr. Blakeney 600mg of Ibuprofen to take four times daily (2400mg a day) for a week, a purely palliative measure.

64.    Staff also noted in his records that he should be evaluated again in two weeks and if his condition did not improve, he "needs an exam and suppository" and an evaluation with general surgery.

65.    But though his symptoms did not improve, BOP staff never scheduled or facilitated a surgical evaluation of Mr. Blakeney.

66.    Mr. Blakeney later told his aunt: "They ain't really do much but tell me to continue drinking plenty of water and keep using the stuff on commissary basically."

67.    But Mr. Blakeney's pain did not subside.

68.    On March 21, 2023, after more than a month of unresolved pain, John Doe staff again prescribed Mr. Blakeney 600mg of Ibuprofen to take four times daily (2400mg a day) for a week—the very same dosage they gave him two weeks earlier—despite his lack of clinical improvement.

69.    John Doe staff took no further action to investigate or address the cause of Mr. Blakeney's ongoing and worsening pain. They did not order any bloodwork, imaging, or refer Mr. Blakeney to an outside provider to determine the cause of his weeks-long pain.

70.    Nine days later, on March 30, Mr. Blakeney returned yet again to the prison medical clinic.

71.    This time, Mr. Blakeney reported to John Doe medical staff that he was bleeding from his rectum with and after "almost every" bowel movement and rated his pain as a 7 out of 10—significantly greater than his earlier-reported pain. He again reported to them no improvement even with continued use of the commissary items staff had recommended for hemorrhoids.

72.    Nevertheless, John Doe staff again merely advised him to drink fluids and to return to the sick call if he was "still having GI issues."

73.    John Doe staff also prescribed him hydrocortisone suppositories and more Ibuprofen.

74.    Despite escalating symptoms, including pain and frequent rectal bleeding, and a history of abdominal pain months before, BOP staff did not perform any diagnostic testing or further evaluation to determine the cause of his symptoms.

75.    A week later, on April 6, Mr. Blakeney told his mother he was still in pain.

76.    A reasonable medical provider operating at the appropriate standard of care faced with a patient reporting consistent and unrelenting abdominal and rectal pain and rectal bleeding for six weeks would have immediately ordered a comprehensive diagnostic evaluation, including blood tests, imaging, and endoscopic examination such as a colonoscopy and/or upper endoscopy.

77.    Yet despite Mr. Blakeney's repeated reports of severe pain and rectal bleeding, John Doe BOP staff failed to perform even the most basic of diagnostic steps at that point. They did not even conduct a physical exam of Mr. Blakeney's rectum to confirm whether his reported abdominal and rectal pain and bleeding were in fact due to hemorrhoids. They did not draw labs to evaluate Mr. Blakeney's iron levels or organ function, a step that was readily available to them, nor did they order any immediate imaging or endoscopic evaluation to evaluate the source of his symptoms. John Doe BOP staff simply took no action whatsoever at the time.

78.    Instead, BOP staff requested a "non-emergent" general surgery consultation for Mr. Blakeney with a "target date" of May 26, 2023—months later. By that day, Mr. Blakeney was dead.

### *Mr. Blakeney Is Subjected to Brutal, Ongoing, and Unnecessary Force*

79.    Back in November 2022, when Mr. Blakeney first arrived at USP Canaan, Mr. Blakeney applied for and was accepted into the Challenge Program and was placed on the Challenge Unit.

80.    The Challenge Program is a residential treatment program developed for incarcerated individuals with substance abuse, mental health, or co-occurring disorders.

81.    Once in the program, incarcerated individuals with mental health issues are supposed to receive specialized programs and additional contact hours based on their needs.

82.    While in the Challenge Program, Mr. Blakeney repeatedly told his treatment specialist that he needed additional mental health help, but he did not receive it.

83.    He expressed concerns to family members and to his lawyer-advocate that he was not receiving appropriate mental health treatment at USP Canaan. The last time his lawyer-advocate spoke with him, Mr. Blakeney told her that USP Canaan had switched his medication and that he had concerns about his safety.

84.    On **May 2, 2023**, John Doe officers forcibly removed Mr. Blakeney from his cell in Canaan's Challenge Unit.

85.    The purported reason for the use of force was Mr. Blakeney's suspected use of K2, a synthetic marijuana.

86.    There was no allegation that Mr. Blakeney was a physical threat to himself or others.

87.    John Doe officers shot Mr. Blakeney with two bursts of pepper spray, two bursts of pepper ball gun spray, two 40-mm munitions, and two sting ball grenades.

88.    Mr. Blakeney sustained multiple wounds including bruises and cuts over his body. His medical records particularly note an obvious circular wound on his left forearm above his elbow.

89.    That wound was still present and open 23 days later, at the time of Mr. Blakeney's autopsy:



*Figure 3: Left forearm, exterior*

90.    John Doe staff then transported Mr. Blakeney to solitary confinement in the Special Housing Unit ("SHU") and placed him in four-point restraints.

91.    John Doe staff used hard metal restraints to shackle Mr. Blakeney, despite federal regulations requiring that soft restraints be used wherever possible.

92.    John Doe staff documented no justification for using hard restraints instead of soft restraints.

93.    In four-point restraints, Mr. Blakeney was forced to lie immobilized, with his wrists and ankles bound to the bed, severely restricting his movement and causing him pain and humiliation.

94.    The force used to extract, restrain, and immobilize Mr. Blakeney was grossly disproportionate to any legitimate correctional or clinical need. BOP staff were aware that Mr. Blakeney had significant mental health issues, and their use of force was excessive and punitive rather than necessary to secure the safety and security of himself and/or staff.

95.     Prior to this use of force, John Doe staff "medically cleared" Mr. Blakeney for the use of chemical and non-lethal munitions as part of their use-of-force procedures to extract him from his cell. This medical clearance was given despite Mr. Blakeney's documented, ongoing reports of abdominal and rectal pain and bleeding with and after almost every bowel movement in the weeks leading up to May 2.

96.     BOP regulations recognize that the use of four-point restraints carries a substantial risk of causing serious physical and psychological harm. Accordingly, the BOP's regulations and policies impose strict limits on the use of such restraints including the following requirements:

(a) Four-point restraints may be used only when the facility's warden "determines that four-point restraints are the *only* means available to obtain and maintain control over an inmate." 22 C.F.R. § 552.24 (emphasis added).

(b) BOP staff must check on any individual confined in four-point restraints every 15 minutes to ensure the restraints "are not hampering circulation" and "for the general welfare" of the individual. 22 C.F.R. § 552.24(d).

(c) A BOP lieutenant must review the inmate's status every two hours to determine if the use of four-point restraints has "had the required calming effect" so the individual may be released from the restraints "as soon as possible." 22 C.F.R. § 552.24(e).

(d) At every two-hour review, the individual must be afforded the opportunity to use the toilet, and must be "periodically rotated" to avoid soreness and stiffness. 22 C.F.R. § 552.24(d), (e).

(e) When it is "necessary" to hold an individual in four-point restraints for more than eight hours, the BOP Warden must notify the Regional Director of this decision. 22 C.F.R. § 552.24(g).

(f) Use of four-point restraints beyond eight hours requires supervision by qualified health personnel. 22 C.F.R. § 552.24(f).

83.    John Doe staff violated these requirements, including without limitation by failing to monitor Mr. Blakeney's condition at 15-minute intervals and by holding him in four-point restraints for nearly *two straight weeks* without justification.

### *BOP Staff Subject Mr. Blakeney to Prolonged, Excessive Use of Four-Point Restraints, Endangering His Physical and Mental Health*

<u>BOP staff continuously restrain Mr. Blakeney in metal four-point restraints from May 2 to May 11, 2023.</u>

84.    From **May 2 to May 11, 2023**, USP Canaan staff kept Mr. Blakeney continuously shackled in hard, metal four-point restraints inside a solitary confinement cell. Throughout this time, he remained immobilized, often lying flat—or even face down—in obvious physical distress, which was ignored by John Doe staff.

85.    Nothing in the records produced through a Freedom of Information Act Request suggests, let alone shows, that four-point restraints were the *only* means of controlling Mr. Blakeney throughout this lengthy period. *C.f.* 28 C.F.R. § 552.24.

86.    Instead, John Doe staff kept Mr. Blakeney fully restrained, apparently because he was, at times, "agitated" and "refusing to follow medical commands." John Doe staff took no action other than restraining him by his wrists and ankles to address Mr. Blakeney's alleged agitation.

87.    Even when Mr. Blakeney was observed to be "passive," John Doe BOP staff still kept him in four-point restraints and failed to record any justification for not removing the restraints.

88.    Throughout these nine days, Mr. Blakeney's **heart rate was clearly elevated**—even though he was restrained to a bed. BOP staff consistently recorded his heart rate as between 97 and 132 beats per minute, well above normal resting levels, especially for a 32-year-old man.

89.    Even though a person with a heartrate over 100 beats per minute is experiencing tachycardia, John Doe staff recorded Mr. Blakeney's pulse as "normal."

90.    While restrained, Mr. Blakeney developed progressively worsening swelling in his hands and feet. John Doe medical staff documented **abrasions, open wounds, and broken skin** at the restraint sites, yet continued to keep him shackled without reassessment or effective wound care.

91.    Throughout this nine-day period, John Doe staff repeatedly noted that Mr. Blakeney either refused or was unable to accept offered water. In six days, from May 2 to May 8, Mr. Blakeney is documented as drinking only one cup of water (on May 5). And for three days from May 8 to the 11, he is documented as only having had approximately eight cups of water total.

92.    Despite this, there is no documentation indicating that staff attempted alternative methods to ensure Mr. Blakeney remained hydrated. On May 11, 2023, BOP medical staff documented that Mr. Blakeney appeared **dehydrated**, noting that he would "likely need IV fluids" soon. But no IV was given.

93.    Critically, there is also no documentation that Mr. Blakeney was offered and/or consumed food throughout this nine-day period apart from two isolated

instances, on May 8 and May 11, when BOP staff noted he had a "banana" and "one cup of milk."

94.    On May 10, Mr. Blakeney was forcibly transitioned from lying on his back (supine) to lying face down (prone), still in the metal four-point restraints. BOP staff documented that Mr. Blakeney had been found lying in his own urine. **He was left shackled face-down for four hours** before he was transitioned to his back again.

95.    On May 10 and 11, 2023, BOP medical staff documented that Mr. Blakeney was "tachycardic" but took no further action.

96.    Despite obvious signs of Mr. Blakeney's physical deterioration—including visible edema (swelling), wounds, and consistent tachycardia—BOP staff kept him immobilized in metal four-point restraints for **nine days**.

97.    During this time, BOP staff repeatedly documented that Mr. Blakeney was urinating on the floor. They also reported he was stating he was an "angel from god," clearly indicating he was in a delusional and/or delirious state. But John Doe BOP staff still did not take any appropriate action to address Mr. Blakeney's obvious decompensation. Rather, John Doe staff advised Mr. Blakeney to "regain control of his emotions" and "follow staff commands" while leaving him shackled to the bed by his arms and legs in a solitary confinement cell.

98.    Not only did BOP staff fail to properly monitor and treat Mr. Blakeney's obvious physical and psychological needs, as they were required to do, John Doe staff instead subjected him to **repeated**, **excessive uses of force** while restrained.

99.    On May 5, 2023, John Doe staff subjected Mr. Blakeney to a "calculated use of force" after he purportedly refused to step down from four-point restraints to hand restraints. BOP staff sprayed him with pepper spray, used two bursts of pepper

ball gun spray, and shot him with two 40-mm munitions and two sting ball grenades. In other words, BOP staff justified the use of excessive force against Mr. Blakeney by claiming he refused to allow himself to be subjected to *less-restrictive* restraints. Mr. Blakeney was noted by John Doe medical staff as having multiple abrasions and bruises on his back and buttocks as a result.

100.    Later that day, John Doe staff documented that Mr. Blakeney had an elevated heartrate of 110 beats per minute, had broken skin on both of his wrists from the hand restraints, and had urinated on the floor. Still, BOP staff did not remove him from the four-point restraints.

101.    On May 7, BOP staff purportedly tried to move Mr. Blakeney from four-point restraints to "ambulatory restraints"—*i.e.*, shackles that would allow him to move and walk—for the first time in five days. But according to BOP staff, Mr. Blakeney allegedly became agitated and was "yelling and threatening staff" when they tried to take him out of the four-point restraints. Yet only hours later, Mr. Blakeney is documented as telling staff that he was desperate to get out of the restraints.

102.    Instead of removing the four-point shackles, BOP staff subjected Mr. Blakeney to another "immediate use of force" and determined he would remain in four-point restraints.

103.    Nothing in the records produced by BOP through a Freedom of Information Act Request suggests, let alone shows, that four-point restraints were the *only* means of controlling Mr. Blakeney throughout this time. To the contrary, BOP staff often noted no behavioral issues whatsoever beyond Mr. Blakeney refusing to answer their questions—which is clearly insufficient to show that continued four-point restraints were necessary or clinically appropriate. *C.f.* 28 C.F.R. § 552.24.

104.    In the meantime, John Doe staff clearly documented obvious physical signs and symptoms that Mr. Blakeney's medical condition was rapidly deteriorating while in the restraints.

105.    For example, on May 8, John Doe medical staff noted that Mr. Blakeney was suffering from "+3 edema" in his right hand, with "+2-3 edema in his feet," and "+1 edema on his left hand." Mr. Blakeney was clearly suffering from clinically significant swelling in his right hand and his feet, as "+3 edema" means that his skin took *longer than a minute* to rebound when pressed, indicating serious fluid buildup and poor circulation. Mr. Blakeney was also still tachycardic: staff recorded his heartrate as 112 beats per minute that day.

106.    In addition to these objective signs that Mr. Blakeney was in need of urgent medical attention, he also reported to BOP staff that he had pain and aching all over his body.

107.    On May 8, John Doe medical staff ordered a "stat" panel of laboratory tests for Mr. Blakeney. This included an extra order for "prealbumin blood work." Prealbumin is a blood protein that drops very quickly in cases of severe malnutrition or protein deficiency. Mr. Blakeney's medical records note that this test was requested "due to concerns of hunger strike."

108.    On May 9, BOP medical staff received the results of Mr. Blakeney's bloodwork. His lab results showed clear signs on inflammation and/or infection. His white blood cell ("WBC") count was elevated above normal limits, and both his neutrophil and monocyte counts were abnormally high, suggesting his body was fighting a serious internal infection or inflammation.

21

109.    Despite these obvious red flags, John Doe BOP staff did not take any steps to investigate the underlying cause of these abnormalities, failing to perform any additional diagnostic testing or otherwise evaluate Mr. Blakeney.

110.    Mr. Blakeney's bloodwork also showed **significant dehydration**, reflected by his elevated blood urea nitrogen ("BUN") level. Mr. Blakeney also had markedly elevated AST and ALT enzymes, which indicate **impaired liver function**.

111.    For comparison, in December 2022 when Mr. Blakeney's bloodwork was first done at USP Canaan, his BUN was 19—a normal range—but in May 2023, it was 39, more than double. This was a clear indication that he was severely dehydrated, which was impacting his kidneys. Similarly, his AST and ALT enzymes were 21 and 19, respectively in December 2022, but in May 2023, they'd elevated to 98 and 75, indicating significant liver distress and/or damage. Mr. Blakeney's WBC count had also tripled from December 2022 to May 2023, an obvious sign that his body was fighting an infection.

112.    In other words, Mr. Blakeney arrived at USP Canaan in late 2022 with normal kidney and liver function—but by May 8, 2023, his labs showed **marked stress and/or damage to his kidneys and liver**. These stark changes should have triggered additional diagnostic testing and treatment, especially in light of Mr. Blakeney's previous history of serious and prolonged abdominal and rectal pain, including bleeding. But John Doe staff utterly failed to address his critical medical condition.

113.    On May 9 at approximately 12:30pm, Mr. Blakeney was placed in ambulatory hand and leg restraints for a period of approximately two hours. But just hours later, around 2:30pm, John Doe BOP staff reported that he was "agitated,

refusing to follow medical commands" and "bit the tongue depressor during exam," and so they again forcibly placed him back into four-point restraints.

114.    With the exception of approximately two hours on May 9, Mr. Blakeney was kept bound to the bed, shackled in metal four-point restraints continuously from approximately the afternoon of May 2 until the morning of May 11.

115.    Defendant John Roe #1, the USP Canaan Warden, authorized the use of the metal four-point restraints in the first instance. John Roe #1 Warden also determined that Mr. Blakeney should be kept in these restraints for a prolonged period of nearly nine days.

116.    Defendant John Roe #2, the BOP's Regional Medical Director, was made aware of and approved the prolonged use of four-point restraints against Mr. Blakeney for nearly nine days.

117.    Per BOP regulations, this extensive period of restraint required: (1) authorization from the Warden in the first instance; (2) authorization from John Doe BOP Lieutenant(s), who were required to review Mr. Blakeney's status *every two hours* to determine if the use of four-point restraints remained necessary; and (3) authorization from the John Roe #2 BOP Regional Director, whom John Roe #1 Warden was obligated to notify by phone of Mr. Blakeney's status in four-point restraints after he was held for over eight hours.

118.    The decision of John Roe Warden and John Roe Regional Director to authorize Mr. Blakeney's continued and prolonged restraint was in violation of BOP regulations—including that "soft" restraint be used, that four-point restraints are appropriate only if such restraints are the *only* means available to "maintain control" over an incarcerated person, and that any restrained individual must be transitioned out

of the restraints "as soon as possible." *Cf.* 28 C.F.R. § 552.24. During those nine days, there were other means available to BOP staff to maintain control over Mr. Blakeney.

119.    From May 2 to May 11, BOP staff consistently documented that Mr. Blakeney was suffering from edema and tachycardia. Mr. Blakeney was also clearly not consuming sufficient nutrition or hydration and had evident weight loss. But despite these obvious signs that Mr. Blakeney's body was in serious physical distress and required urgent medical attention, John Doe staff ignored those signs and took no action to provide appropriate medical attention.

120.    No staff member recorded any concern in the medical records that Mr. Blakeney's heartrate had been elevated for days—despite his being shackled to a bed without moving. To the contrary, even when BOP staff recorded Mr. Blakeney's heartrate as 120+ beats per minute while restrained laying down, they consistently documented his vital signs as "normal" or "unremarkable."

121.    During this entire time, Mr. Blakeney was kept in an isolated cell in the SHU. He was deprived of contact with his family members, his lawyer-advocate, and anyone other than BOP staff. While shackled to the bed, Mr. Blakeney was entirely dependent on John Doe BOP staff to provide him with food, water, access to the toilet, and appropriate medical treatment.

122.    The actions of USP Canaan staff during this time—including their deliberate failure to provide basic nutrition, hydration, and adequate medical monitoring and/or escalation of care—exhibited a reckless disregard for Mr. Blakeney's serious medical needs and a callous indifference to his suffering.

123.    The excessive and repeated force used against Mr. Blakeney by John Doe staff—including during and after he had been fully restrained and unable to pose any

physical threat—was not applied in an effort to restore discipline or maintain safety. Rather, as evidenced by the length, frequency, and brutality of the force used, it was administered maliciously and sadistically to cause harm. Mr. Blakeney was pepper-sprayed, shot with pepper ball rounds, and struck with less-lethal munitions on multiple occasions.

124.    Mr. Blakeney ultimately died with extensive, unexplained injuries consistent with assault, including two prominent black eyes—signs of blunt force trauma to his face—which BOP staff never documented or explained.

125.    During this time, Mr. Blakeney was also subjected to nine days of immobilization in metal four-point restraints, including at least four hours shackled in a prone, face-down position, even when visibly delirious and physically deteriorating.

126.    The prolonged use of this most extreme form of restraint—lasting nearly two weeks—was entirely disproportionate to any need to secure Mr. Blakeney for his safety or the safety of others or ensure discipline. The force used was unnecessary and served no legitimate penological purpose. Rather, John Doe BOP staff used the restraints to punish Mr. Blakeney not for serious or dangerous infractions but for quotidian (and harmless) behavior, such as "purposely keeping [his] eye[s] closed," "growling" at staff, refusing to "answer or acknowledge staff,", "refus[ing] to talk to staff," yelling, being "uncooperative," and "talking over staff when th[ey] try to talk to him." Instead, John Doe BOP staff acted intentionally to harm Mr. Blakeney because they were annoyed or frustrated by his behavior.

<u>BOP staff continue to ignore Mr. Blakeney's obviously deteriorating
physical and mental health.</u>

127.    Only after almost nine days of nearly continuous immobilization, shackled

on a bed, did BOP staff finally transition Mr. Blakeney to ambulatory restraints.

128.    On May 11, at 8:15am, Mr. Blakeney was moved to ambulatory restraints

and a new cell. He required assistance to reach the new cell. Mr. Blakeney also remained

tachycardic, with staff recording his pulse as 132 beats per minute.

129.    Even after being transitioned from four-point restraints to ambulatory

restraints, Mr. Blakeney's medical and mental condition continued to deteriorate

rapidly.

130.    By May 12, John Doe BOP staff documented that Mr. Blakeney was sitting

naked in his cell, was "very slow" to respond to questions, refusing to engage with staff,

return food trays, or comply with basic orders. Staff requested an "urgent" tele-

psychiatry consult for Mr. Blakeney.

131.    On May 13, John Doe BOP medical staff documented that Mr. Blakeney

had multiple open wounds on his wrists, ankles, and back **showing signs of**

**infection**, with significant swelling. His pain was recorded as a 7 out of 10. Despite

these signs of infection, no further diagnostic testing or hospitalization was ordered.

132.    Instead, on May 13, BOP staff injected Mr. Blakeney with 30mg of

Ketorolac Tromethamine (Toradol)—a strong nonsteroidal anti-inflammatory drug.

Toradol is stronger than Ibuprofen and has been linked to damage to the intestinal tract.

133.    John Doe staff also prescribed Mr. Blakeney 600mg of Ibuprofen twice

daily (1200mg a day) for seven days.

134.    BOP staff took no further steps to address the many alarming symptoms—extreme pain, severe wounds, persistent tachycardia, and edema—demonstrating Mr. Blakeney's significant medical needs.

135.    Over the next several days, Mr. Blakeney's behavior and physical condition further declined. BOP staff noted that he refused medication, tore off wound dressings, and exhibited erratic behavior (e.g., speaking coherently one moment, then "lashing out" the next, accompanied by a notation that "inmate still appears to not be normal").

136.    BOP staff also documented ongoing swelling and evidence of infection.

137.    On May 15, John Doe BOP staff again prescribed Mr. Blakeney 600mg of Ibuprofen twice daily (1200mg a day) for seven days.

138.    On May 15, an outside psychiatric consultant "**strongly recommended**" that Mr. Blakeney be transferred on an emergency basis to a hospital where his status and treatment could be "closely monitored in an inpatient hospital center with medical staff."

139.    The consultant also expressly warned that it was **"imperative" that USP Canaan's medical and psychology departments "collaboratively work together for the continued improvement" of the patient**, warning that Mr. Blakeney's continued decompensation could pose a serious risk to his heath.

140.    These recommendations were reviewed by the BOP Northeast Regional Medical Director John Roe #2 that same morning. However, neither John Roe #2 nor any other BOP staff took any steps to transfer Mr. Blakeney to an outside medical center or provide Mr. Blakeney with any additional physical or mental health care or treatment.

141.    That same day, May 15, BOP medical staff documented that Mr. Blakeney had multiple bruises across his arms and torso, open wounds on his wrists and ankles that were **oozing blood**, and severe swelling in his feet and hands. BOP staff documented that Mr. Blakeney was also suffering from "**third-spacing**"—an abnormal shift of fluid from the bloodstream into the tissues—due to his "inadequate nutrition," which was impairing his healing and circulation.

142.    On May 15, John Doe BOP staff also noted again that Mr. Blakeney had "elevated liver enzymes."

143.    Instead of addressing Mr. Blakeney's obvious medical needs, John Doe BOP staff instead subjected him to yet another **calculated use of force**. On May 16, it was documented that Mr. Blakeney was *forcibly removed* from his cell and *placed in ambulatory restraints* because "his cell was needed" to house another incarcerated person. Mr. Blakeney suffered a head laceration as a result of this excessive and unnecessary force.

144.    Later that day, Mr. Blakeney was **again subjected to use of force** during a John Doe BOP Lieutenant's restraint check. On May 16 at approximately 5pm he was placed *back into metal four-point restraints*—even though he was found to have open wounds from the previous restraints.

145.    On May 17, Mr. Blakeney's wounds were again assessed. John Doe BOP staff documented that his multiple open wounds were "**red and raw, weeping clear fluid**."

146.    Those wounds were still open and visible at the time of Mr. Blakeney's autopsy:



*Figure 4: Left ankle, exterior*



*Figure 5: Left ankle, interior*



*Figure 6: Left wrist, interior*



*Figure 7: Right ankle, exterior*



*Figure 8: Right wrist, interior*

147.    Despite these open and obvious wounds, BOP staff kept Mr. Blakeney in metal four-point restraints.

148.    During this time, Mr. Blakeney's heartrate remained consistently elevated, between 110 and 130 beats per minute.

149.    Mr. Blakeney's rapid weight loss was also obvious to BOP staff. On March 30, 2023, Mr. Blakeney weighed 216 pounds. On May 18, 2023, he weighed 189.9, having lost nearly 27 pounds. By the time of his death on May 23, he weighed only 179.5 pounds—in other words, he lost *36.5 pounds* in less than two months.

150.    On May 16, a BOP Captain was informed by John Doe medical staff that Mr. Blakeney "**must be given his Ensure even if he is in four-point restraints**." The Associate Warden was present for this conversation along with members of the USP Canaan psychology staff. Until this point, John Doe BOP staff had not been

administering Ensure or otherwise providing Mr. Blakeney with adequate food while he was completely restrained for days in four-point restraints.

151.    Despite this directive, and although Ensure nutrition supplements were ordered starting on May 16, medical records show that Mr. Blakeney either physically could not consume the supplements or was not properly assisted in doing so as his intake was inconsistent during this time period. BOP medical records show that Mr. Blakeney was provided food and drink only inconsistently in the last week of his life.

152.    Duodenal ulcers cause burning pain in the upper abdomen, and this pain is often intensified after eating meals. People suffering from duodenal ulcers, like Mr. Blakeney, frequently avoid eating to minimize their discomfort—which can lead to malnutrition and dehydration.

153.    On May 17 at 8:45pm, Mr. Blakeney was transitioned back into ambulatory restraints. BOP staff documented that he was complaining of pain all over his body.

154.    On May 18, Mr. Blakeney was found standing at his cell door complaining that **he could not breathe**. He reported to staff that he could not catch his breath. His vital signs showed a clearly **elevated heartrate of 130 beats per minute**. He requested an IV for hydration—a clear request for medical help—but John Doe BOP staff refused, instead telling him to "drink fluids," despite his documented ongoing dehydration confirmed by bloodwork, severe malnutrition, and physical decline.

155.    Notably, the BOP did not produce any medical records for Mr. Blakeney from May 19 through May 23, 2023, in response to a Freedom of Information Act Request.

156.    Despite these glaring signs of serious medical issues that required urgent care, John Doe BOP staff utterly failed to treat Mr. Blakeney's medical needs. Taken together, these symptoms would have told any reasonable medical provider that Mr. Blakeney needed to be immediately transferred to an outside medical facility that could examine and monitor him appropriately.

157.    Instead, BOP staff sporadically offered Mr. Blakeney food, water, and Ensure, and prescribed him high-dose Ibuprofen. At no point did BOP staff initiate any appropriate medical intervention, diagnostic examination, or transfer Mr. Blakeney to a hospital for diagnosis and treatment.

158.    On May 23, 2023—after weeks of obvious and escalating medical crisis—Mr. Blakeney was found unresponsive in his cell. A medical emergency was called at 6:30 a.m., and Emergency Medical Services arrived at 7:10 a.m. But Mr. Blakeney could not be revived.

159.    Mr. Blakeney died at just 32 years old, alone in his solitary cell at USP Canaan.

### *Prolonged Physical Restraint Is Known to Cause Serious Mental and Physical Injury, as it Did to Mr. Blakeney*

160.    Prolonged physical restraint is widely recognized as dangerous, especially for people suffering mental or psychological crisis. For example, a Hartford Courant investigation found that, between 1988-1998, at least 142 deaths in mental health settings were connected to the use of physical restraint.

161.    Medical research has consistently shown that prolonged mechanical restraint places individuals at heightened risk for serious physical harms, including but

not limited to circulatory compromise, nerve damage, respiratory failure, cardiac complications, and death.

162.    Extended mechanical restraint is also known to significantly exacerbate psychiatric symptoms, especially among individuals with serious mental illness like Mr. Blakeney. Such prolonged restraint can lead to further psychological deterioration, trauma, and an impaired ability to advocate for their own medical needs.

163.    In clinical psychiatric settings, restraint is rarely used beyond a few hours and is typically accompanied by administration of emergency medication, such as sedatives, to minimize the harm. It is well-established that restraint should not be used as a means of coercion, discipline, convenience, or retaliation.

164.    Correctional standards recognize these dangers. For example, the American Correctional Association's standards requires that four-point restraints be used only in "extreme circumstances" and that they be applied no longer than "absolutely necessary."[6]

165.    Those standards further require that individuals' "medical and mental health condition" be assessed continuously throughout the time they're restrained to safeguard against preventable harm.

166.    Similarly, the National Commission on Correctional Health Care ("NCCHC") directs that clinical restraints should only be used when necessary to prevent imminent harm to a patient or others as a result of mental illness. Any such restraint must be accompanied by a plan to remove the patient from the restraints "as

---

[6] American Correctional Association Performance-Based Standards and Expected Practices for Adult Correctional Institutions (March, 2021), 5-ACI-3A-16 (Ref. 4-4190).

soon as possible." Critically, the NCCHC directly prohibits restraining patients in a manner "that would jeopardize their health or mental health."

167.    Among the NCCHC's express prohibitions is the use of unnatural restraint positions, such as restraining a person face down (prone) or spread eagle. Mr. Blakeney was restrained for at least four hours in the prone position.

168.    Intentional human rights standards, including the United Nation's Convention on the Rights of Persons With Disabilities, classify prolonged mechanical restraint as a form of inhumane and degrading treatment.

169.    In Mr. Blakeney's case, John Doe BOP staff's prolonged use of metal four-point mechanical restraints—spanning almost nine consecutive days, with additional days thereafter—without adequate medical assessment, hydration, nutrition, or psychiatric intervention, constituted a reckless disregard for his health and safety.

170.    John Doe BOP staff's conduct was a clear and substantial departure from both federal BOP regulations regarding four-point restraints and well-established clinical and correctional standards around their use, reflecting a flagrant indifference to Mr. Blakeney's serious medical and mental health needs.

171.    John Doe staff's prolonged use of metal four-point restraints against Mr. Blakeney was not justified or motivated by a good-faith effort to maintain or restore discipline. Rather these restraints were applied in a prolonged, sadistic manner that amounts to torture, as evidenced by the absence of any legitimate clinical or correctional justification for this continued use of force and the severity of Mr. Blakeney's injuries at the time of his death—including the open, infected wounds on his wrists and ankles, and the numerous unexplained bruises and cuts all over his body, such as two prominent black eyes and a head injury on his right temple.

### *BOP Staff Lie to Mr. Blakeney's Mother*

172.    Prior to May 2023, Mr. Blakeney and his mother, Ms. Bynum, typically communicated daily.

173.    Their last communication was April 30, 2023.

174.    Ms. Bynum grew increasingly frantic when she did not hear from her son.

175.    By May 7, she messaged him, "please please be ok."

176.    In early May, around the time Mr. Blakeney was being repeatedly shot with pepper balls and rubber bullets and confined in four-point restraints in solitary confinement, another inmate at USP Canaan called Ms. Bynum to say that Mr. Blakeney had been harmed by UPS Canaan staff.

177.    Ms. Bynum and her daughter Ashley contacted the prison multiple times to ask about Mr. Blakeney's health and safety.

178.    Ms. Bynum messaged her son expressing her grave concerns that "something is wrong" and he was in danger. She promised to visit him that weekend to make sure he was safe. "If you are in the hole, I will find out soon."

5/8/2023 9:05:52 PM

It is not like you to not respond to no one text. That mean something is wrong and I Am calling your lawyer and I will be up there Saturday. If they tell me I can't see you I know something is wrong and I will get you the help you need. That jail is horrible and they are already under investigation I will open a case up.

So if you are in the hole I will find out soon.

I love you son hang in there.

*Figure 9*

36

179.    On May 8, 2023, USP Canaan Executive Assistant Kristin Contruti responded via email: "I can assure you that Mr. Blakeney is alive and well."

180.    Ms. Bynum hoped that this was true.

5/9/2023 4:51:02 AM

Good morning oh how I miss you son. I have called there and they said you are alive and ok. Please please be ok . What is going on . This not like you. What do you need  of me .

*Figure 10*

181.    But the assurances that Mr. Blakeney was "well" were knowingly false.

182.    Just the day before, Mr. Blakeney had been subjected to a use of force by BOP staff.

183.    In fact, in the early morning of May 8, the same day Ms. Contruti told Ms. Bynum her son was doing "well," BOP staff documented that Mr. Blakeney was "agitated," that his heart rate was 112 beats per minute and tachycardic, and that both feet had significant swelling.

184.    That same day, BOP staff also drew "stat" bloodwork from Mr. Blakeney, which reflected that he was fighting infection and suffering from liver damage.

185.    Most importantly, at the time Ms. Contruti assured Ms. Bynum her son was "well," Mr. Blakeney had been kept shackled continuously in four-point restraints for six days since May 2.

186.    After not hearing from him, Ms. Bynum made plans to go visit her son. Although USP Canaan staff initially told her that she could visit, the day before her scheduled visit on May 12, USP Canaan staff informed Ms. Bynum that she would not be allowed to see Mr. Blakeney because he was "not allowed visitors."

187.    Ms. Bynum grew even more terrified that her son was in danger, writing to him that she was trying her best to find out what happened and to get to the prison, and promising to keep writing until she heard back from him.

5/12/2023 8:51:17 AM

Gm I got a call saying something happened . I am trying to get your lawyer Blk find out. Hang i there when you come out of the hole or what ever you are going through just know I love you son. I know that place is horrible but they will get it at the end . I don't care who read this   God  is in control.

I sent you something and I am looking into why they are bother your funds also. Bop

5/12/2023 10:19:19 PM

I will text you every day until I hear from you. I am trying to find out what happened to you son.

Love you always.

*Figure 11*

188.    On May 15, the same day an outside consultant recommended that Mr. Blakeney be emergency transferred immediately to a local medical center for a full evaluation and monitoring, Ms. Bynum messaged her son, praying for his safety.

5/15/2023 7:24:54 PM

Good morning son it's Monday May 15, 2023.I love you and my heart tell me something is wrong. I am going to find out what's going on. I know there are some mean and wicked people in there. Please hang in there and stay prayed up . For I am ok because I am your mother.

*Figure 12*

189.    On May 18, Ms. Bynum contacted Mr. Blakeney's lawyer-advocate pleading: "My son said he was fearing for his life, the lady said that my son [is ok] and that nothing was done. Like I have not heard from son since April, that is not like him…

I called the jail and they just sent me to other numbers.... I called there and they hanging up on me like you don't have any rights."

190.    On May 19, Mr. Blakeney's lawyer called the facility for her scheduled legal call with Mr. Blakeney. She was told that he "declined" the legal call, something he had never done before.

191.    His lawyer requested written documentation of his refusal, but BOP staff refused to provide it.

192.    During that week, Ms. Bynum had several family members call USP Canaan, but no BOP staff would tell them what was really happening to Mr. Blakeney.

193.    Other men incarcerated at USP Canaan called Mr. Blakeney's lawyer to tell her that Mr. Blakeney was in need of help and protection from BOP staff.

194.    On May 22, Ms. Bynum told his lawyer: "I know that the counselor is lying, and that's why I know that something happened to my son, no one can tell me that it didn't...[W]hen I was going up there to see him, that's when they said he could not have any [visitors]. That is because something is wrong."

195.    On May 22, 2023, Ms. Bynum also sent an email to USP Canaan staff asking again about her son's health status, as she and his lawyer had both received phone calls relaying that he was in serious peril. In that email, Ms. Bynum expressed that she was "very scared and worried about [her] son," and pleaded for someone to contact her. She provided Mr. Blakeney's power of attorney, allowing her to access information on his behalf.

196.    No one from BOP responded to Ms. Bynum's inquiry.

197.    That day, she messaged Mr. Blakeney to tell him once again that she loved him.

5/22/2023 7:24:28 AM

> Good morning son it's Monday and even though we have not talk I want to to know that I love you. 💜

*Figure 13*

198.    Ms. Bynum also told his lawyer: "You know me and my son have a bond....
I am never giving up, this is not just another kid that is not love[d] and wanted. He has
mental issues, and they just dismiss it."

199.    Her son was dead less than 24 hours later.

200.    The next communication Ms. Bynum received from USP Canaan staff was
a phone call on the morning of May 23, 2023, informing her that her son was dead. It
was the worst possible confirmation of her fears. The shocking news came without
warning, as John Doe BOP staff had repeatedly evaded her calls and questions and had
lied to her by assuring her that her son was "alive and well."

201.    In the days that followed, Ms. Bynum was unable to eat, sleep, or function.
She was forced to make numerous frantic phone calls trying to locate and retrieve her
son's body. She was repeatedly transferred back and forth between BOP officials, the
chaplain's office, the BOP case management coordinator, the coroner's office, and the
funeral home. Ms. Bynum had to beg for basic information about what had happened to
her son to cause his death and what was happening to his body, as John Doe BOP staff
continued to mislead her about the true circumstances of his death.

202.    During these days, Ms. Bynum learned for the first time from the coroner
that Mr. Blakeney died with wounds from restraints on his wrists and ankles and with
two black eyes. Meanwhile, John Doe BOP staff continued to ignore her pleas for
additional information about what happened to her son in the last days of his life.

203.    After Mr. Blakeney's death, John Doe BOP staff authorized the embalming of his body without Ms. Bynum's knowledge or consent. Mr. Blakeney was a practicing Muslim, and this decision was contrary to his Islamic faith. By the time Ms. Bynum received definitive information about the location and status of his body, her son's body had already been embalmed. She was shocked and horrified to learn that her son's religious beliefs had been violated and that she had been denied even the opportunity to ensure he received a proper burial.

204.    In short, BOP staff's actions in the aftermath of Mr. Blakeney's tragic death deprived Ms. Bynum of the ability to protect her son's dignity in death and to properly mourn him. These actions and omissions compounded the extreme emotional and physical anguish she was already suffering.

### *Mr. Blakeney Dies of an Easily Treatable Condition that Went Ignored*

205.    On the morning of May 23, 2023, Mr. Blakeney was found dead in his cell. He was only 32 years old.

206.    In the critical four days leading up to his death, between May 19 and May 23, there are *no* documented medical visits or records in the medical file produced by BOP pursuant to a Freedom of Information Act request.

207.    An autopsy report determined the cause of Mr. Blakeney's death to be gastrointestinal hemorrhage due to a duodenal ulcer. There were no signs of malignancy.

208.    The ulcer was extraordinarily large, encroaching into Mr. Blakeney's pancreas—an indication that it had been developing over many weeks. An ulcer of that size would have caused Mr. Blakeney extreme pain during that time.

209.    During those same weeks, Mr. Blakeney was shackled in metal four-point restraints that severely limited his ability to advocate for himself or communicate the seriousness of his medical symptoms, especially as John Doe BOP staff during this time period continued to inflict *additional* physical harms on Mr. Blakeney including but not limited to bruises, abrasions, open wounds and sores, a forehead laceration, and two black eyes.

210.    At the time of his death, Mr. Blakeney had numerous physical injuries *in addition to* the ulcer including but not limited to: (1) mild brain edema; (2) multiple lesions on his ankles and wrists; (3) bruising around both eyes; (4) a contusion on his right chest wall; (5) contusions and abrasions on his right knee; (6) contusions to his right lower legs; (7) a partially-crusted abrasion on his right ankle; (8) black eschar (thick, black necrotic tissue) on his right lateral ankle; (9) ulcerated lesions on his left hip and thigh; (10) multiple healing lesions on his left calf with black eschar present; (11) ulceration of his left ankle with a moist yellow base; (12) multiple contusions on both his biceps and triceps; (13) abrasions on his right wrist with brown eschar present and scabbed abrasions; (14) scabbed lesions on his forearms; (15) open wounds on his wrists with pink-yellow moist bases; and (16) a contusion on his right temple.

211.    In other words, there were multiple visible injuries and wounds all over his body—wounds that BOP staff had inflicted and then ignored for weeks.

212.    Throughout this period BOP staff callously ignored several obvious signs of Mr. Blakeney's physical and physiological decline—his persistent tachycardia, shortness of breath, edema, mental confusion, rapid weight loss and abnormal bloodwork, among other things—all of which are clinical red flags that require medical follow-up and treatment.

213.    Instead of making any effort whatsoever to diagnose or treat Mr. Blakeney, or to transfer him to an outpatient hospital where he could be properly observed, BOP staff instead repeatedly prescribed and administered to Mr. Blakeney high-dose Ibuprofen in the weeks and months before his death. They also administered a powerful non-steroidal anti-inflammatory drug (Toradol) the week before his death. Both these medications are well-known risk factors for gastrointestinal ulcers and bleeding. But BOP staff administered them without performing any monitoring to ensure that he had not developed an ulcer.

214.    The autopsy findings confirmed that Mr. Blakeney's gastrointestinal system was filled with dark, tarry stool—with his colon having soft tarry, black-red material at the time of his death—evidence of massive internal bleeding, which was most likely visible externally as rectal bleeding in the hours before his death. Indeed, the "black tarry" material in his digestive track indicates that Mr. Blakeney did not die immediately but rather slowly bled out internally with enough time for the blood to be digested and transported from his stomach down to his colon.

215.    In the final hours of his life, Mr. Blakeney would have been unmistakably very sick—likely exhibiting symptoms of severe internal bleeding, weakness, and shock—yet BOP staff continued to ignore him and did nothing to help him.

216.    Mr. Blakeney's death was not inevitable. If BOP staff had conducted even basic diagnostic testing—such as ordering an endoscopy—at any time in the weeks before May 23, his ulcer could have been diagnosed and treated, and he would not have died.

217.    If BOP staff had not ignored the "strong recommendation" of the consulting doctor on May 15 that he be emergency transferred to a hospital where he

"could be closely monitored" by medical staff, Mr. Blakeney's obvious signs and symptoms would not have been ignored, and his death would have been prevented.

218.    Moreover, if BOP staff had not ignored obvious signs that Mr. Blakeney was in critical distress in the final hours of his life and had instead ordered an emergency transfer, Mr. Blakeney could have been surgically treated—by cauterizing the burst blood vessel—and his life saved.

219.    Instead, BOP staff chose to leave Mr. Blakeney restrained, isolated, and untreated—ignoring every clinical indicator that he was in medical crisis. Their sustained failure to act—despite clear and escalating signs of pain, injury, and life-threatening medical crisis—demonstrated a callous disregard for Mr. Blakeney's life and serious medical needs.

220.    As a result, Mr. Blakeney died a slow, painful, and entirely preventable death of a gastric ulcer at only 32 years old, and he suffered unimaginable physical and emotional pain in the weeks and hours leading up to his untimely death.

### Mr. Blakeney and His Mother Both Suffer Grievously

221.    Throughout Mr. Blakeney's final few months of life, he endured profound and escalating physical and emotional pain.

222.    As Mr. Blakeney repeatedly told BOP staff—and his mother and aunt—in the months before his death, he was in persistent, wretched abdominal and rectal pain and then bleeding during and after almost every bowel movement. For weeks, he complained of ongoing pain that grew more severe, even with the topical ointments and Ibuprofen BOP staff told him to use.

223.    While chained and confined in isolation for nearly two weeks, Mr. Blakeney suffered extreme physical and emotional pain. Mr. Blakeney experienced

constant pressure and injury at the restraint sites. The shackles dug and cut into his wrists and ankles, leaving open bleeding and seeping wounds that became visibly infected. He was left hungry and thirsty. He was often forced to urinate on the floor or himself, a degrading and humiliating experience.

224.    Over the course of three weeks in May, Mr. Blakeney was repeatedly subjected to additional brutal force—shot with rubber bullets and pepper spray and physically beaten by John Doe officers—while vulnerable and clearly decompensating. This abuse caused significant discomfort, pain, and bruising, including extensive bruising to his face and head. At the time of his death, he had two prominent black eyes.

225.    In the days and weeks leading to his death, Mr. Blakeney also experienced significant pain from the large ulcer growing inside his intestinal tract, as it eventually protruded from his intestine into his pancreas. He felt dizzy and unable to catch his breath. When he asked for IV fluids after having trouble eating and drinking, his request was denied.

226.    In the hours before his death, Mr. Blakeney's suffering only intensified. As his untreated ulcer hemorrhaged, Mr. Blakeney was conscious as he slowly and painfully bled to death internally. He was conscious and alive long enough to suffer through not only the physical pain but also the psychological fear and terror of his impending death.

227.    Mr. Blakeney died alone, in obvious medical crisis, with his body covered in untreated wounds. He had not been allowed to speak with his mother, his daughter, or anyone other than BOP staff for weeks before his death.

228.    In short, Mr. Blakeney experienced excruciating pain and suffering for a substantial period of time.

229. Ms. Bynum, his mother, likewise suffered and continues to suffer extraordinary psychological distress. When without warning she suddenly stopped hearing from her son, who generally contacted her every day, she pleaded with BOP staff for answers. She was falsely assured he was "alive and well," even as he was being restrained, starved, and brutalized. She felt panic and terror when she could not reach her son.

230. Ms. Bynum was denied the ability to see or speak to her son during the final weeks of his life.

231. When she finally learned of his death, it was a devastating shock. She was unable to sleep, eat, or stop crying for weeks. To this day, she weeps when she talks about Mr. Blakeney and his cruel treatment at USP Canaan. As a result of John Doe BOP staff's actions, Ms. Bynum now has to live everyday with the knowledge that her son died slowly, in agony, from an easily preventable death while no one helped him.

232. Ms. Bynum saw a therapist twice a week for over year, as she struggled to live in the aftermath of her son's death.

233. To this day, she continues to have difficulty sleeping and constantly ruminates over the loss of her son. She frequently cries and struggles with feelings of anxiety and depression. She struggles to focus on and complete everyday tasks. She misses her son every day.

**WRONGFUL DEATH AND SURVIVAL ACTIONS**

234. Ms. Bynum, as Administrator of the Estate of David Blakeney, brings this action on behalf of Mr. Blakeney's heir under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

235.    Mr. Blakeney's heir under the Wrongful Death Act is his daughter, A.M.B., a minor who lives in Washington, D.C.

236.    Mr. Blakeney did not bring an action against Defendants for damages for the injuries causing his death during his lifetime.

237.    Mr. Blakeney's heir has, by reason of Mr. Blakeney's death, suffered pecuniary loss and has incurred expenses for the costs of his funeral, the cost of his headstone, and the costs of administering his estate.

238.    Mr. Blakeney's heir has, by reason of his death, suffered further pecuniary loss including expected contributions and financial support from Mr. Blakeney for food, clothing, shelter, medical care, education, entertainment, recreation and gifts.

239.    Plaintiff also brings this action on behalf of the Estate of David Blakeney under the Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, under which all claims Mr. Blakeney would have been able to bring had he survived may be brought by his estate.

240.    Mr. Blakeney's estate has, by reason of his death, suffered pecuniary loss and has incurred expenses for the costs of his funeral, the cost of his headstone, and the costs of administering his estate.

241.    As a direct and proximate result of the conduct of all Defendants, Mr. Blakeney experienced extraordinary physical and emotional pain and suffering before his death, and, as a result of his death, suffered complete loss of earnings and earnings capacity.

242.    Plaintiff, via this survival action, seeks damages for these harms caused to Mr. Blakeney.

**FIRST CAUSE OF ACTION**
**Federal Tort Claims Act – Medical Malpractice**
**(Against the United States of America)**

243.    At all relevant times, Defendant United States of America, by and through its agents and employees, including medical professionals employed by the BOP had a non-delegable duty to provide Mr. Blakeney with reasonable medical care while in the care, custody, and control of the BOP.

244.    At all relevant times, Defendant United States of America, by and through its agents and/or employees, including medical professionals employed by the BOP, had a duty to render medical and mental health care to Mr. Blakeney in a skillful and careful manner in accordance with the accepted professional standards of medical care and treatment rendered by reasonably prudent health care providers in the community.

245.    Defendant United States of America, by and through its staff, physicians, nurses, health administrators, and employees, acting within the scope of their employment and/or agency, breached the duty of care owed to Blakeney and failed to provide care in accordance with prevailing professional standards, including but not limited to by:

     a.  failing to timely and accurately diagnose his ulcer condition;

     b.  prescribing medications that caused or exacerbated the ulcer;

     c.  preventing him from accessing any medical care by locking him into four-point restraints for more than 10 days out of 15;

     d.  causing him to lose a massive amount of weight by locking him into four-point restraints for more than 10 days out of 15;

     e.  failing to transfer him to emergency medical care after it was recommended;

f.   failing to provide him with psychiatric care;

g.   failing to treat his edema, sustained tachycardia, and/or massive weight loss; and

h.   failing to notice and treat the massive bleeding that led to Mr. Blakeney's death.

246.   At the time of the relevant acts and/or omissions, the relevant employees and/or agents of the United States of America were acting within the scope of their employment with the BOP.

247.   As a proximate result of the conduct of employees and/or agents of Defendant United States of America, Plaintiff suffered the damages hereinbefore alleged, including conscious pain and suffering and death.

## SECOND CAUSE OF ACTION
## Federal Tort Claims Act – Negligence
## (Against the United States of America)

248.   Plaintiff repeats the preceding allegations as if fully set forth herein.

249.   At all relevant times, Defendant United States of America, by and through its agents and employees, including medical professionals employed by the BOP, had a duty of reasonable care to Plaintiff, including the duty to provide Plaintiff with reasonable medical care and mental health treatment.

250.   Defendant United States of America, by and through its staff, physicians, nurses, health administrators, and employees, acting within the scope of their employment and/or agency, breached the duty of care owed to Plaintiff, including by:

i.   failing to timely and accurately diagnose his ulcer condition;

j.   prescribing medications that caused or exacerbated the ulcer;

k.  preventing him from accessing any medical care by locking him into four-point restraints for more than 10 days out of 15;

l.  causing him to lose a massive amount of weight by locking him into four-point restraints for more than 10 days out of 15;

m.  failing to transfer him to emergency medical care after it was recommended;

n.  failing to provide him with psychiatric care;

o.  failing to treat his edema, sustained tachycardia, and/or massive weight loss;

p.  failing to notice and treat the massive bleeding that led to Mr. Blakeney's death; and

q.  failing to provide Mr. Blakeney with adequate or appropriate mental health treatment.

251.  At the time of the relevant acts and/or omissions, the relevant employees and/or agents of the United States of America were acting within the scope of their employment with the BOP.

252.  As a proximate result of the conduct of employees and/or agents of Defendant United States of America, Plaintiff suffered the damages hereinbefore alleged, including conscious pain and suffering and death.

**THIRD CAUSE OF ACTION**
**Eighth Amendments (*Bivens*)**
**(Against John Does #1-10)**

253.  Plaintiff repeats the preceding allegations as if fully set forth herein.

254.  Mr. Blakeney had a serious medical condition—namely, persistent pain, edema, tachycardia, dehydration, malnourishment, severe mental illness, and open

wounds—that was caused and/or worsened by BOP's and its employees' and/or agents' actions and omissions, including their failure to take steps to diagnose, evaluate, treat, and monitor his condition.

255.    The John Doe Defendants knew or should have known that their actions, including prescribing Mr. Blakeney high-dose Ibuprofen for an extended period of time, subjecting him to conditions that left him dehydrated and malnourished, and their omissions, including ignoring his repeated complaints of abdominal pain and blood in his stool and weeks of a tachycardic heartrate, failing to provide him with his medications, and failing to take him to an emergency medical provider when advised to do so, would pose an unacceptable risk of serious physical harm.

256.    Once the chart reviewer determined that Mr. Blakeney was in need of an emergency transfer to a local medical center, the John Doe Defendants knew or should have known that failing to transfer Mr. Blakeney for medical attention would pose an unacceptable risk of serious physical harm.

257.    Despite their knowledge, the John Doe Defendants failed to act to ensure that Mr. Blakeney received proper medical attention and care, including failing to ensure his Ibuprofen intake was monitored, that he was receiving his prescribed medications, and that his abdominal paid was addressed.

258.    As a proximate result of the John Doe Defendants' conduct, Mr. Blakeney suffered the damages hereinbefore alleged.

**FOURTH CAUSE OF ACTION**
**Federal Tort Claims Act – Assault**
**(Against United States of America and John Does #5-10)**

259.    Plaintiff repeats the preceding allegations as if fully set forth herein.

260.     Between May 2, 2023, and May 23, 2023, employees, servants, and/or agents of the United States of America placed Mr. Blakeney in fear of imminent harmful or offensive contact, proximately causing injury to him, including by subjecting him to repeated, unnecessary, and excessive force.

261.     Such contact would have been without provocation or lawful privilege.

262.     Defendant United States of America is liable for the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
### Federal Tort Claims Act – Battery
### (Against United States of America and John Does #5-10)

263.     Plaintiff repeats the preceding allegations as if fully set forth herein.

264.     Between May 2, 2023 and May 23, 2023, employees, servants, and/or agents of the United States of America, made harmful and excessive contact with Mr. Blakeney, including by subjecting him to repeated, unnecessary, and excessive force, proximately causing injury to him.

265.     Such contact was without provocation or lawful privilege and was excessive and greater than necessary.

266.     Defendant United States of America is liable for the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION
### Federal Tort Claims Act – Intentional Infliction of Emotional Distress – David Blakeney
### (Against All Defendants)

267.     Plaintiff repeats the preceding allegations as if fully set forth herein.

268.     The actions and inactions of BOP medical and correctional staff, including John Roe #1 and #2, were extreme and outrageous.

269.    The actions and inactions of BOP medical and correctional staff, including John Roe #1 and #2, were intended to cause Mr. Blakeney emotional distress or were undertaken with reckless disregard of the fact that such distress would occur.

270.    As a result of the actions and inactions of BOP medical and correctional staff, including John Roe #1 and #2, Mr. Blakeney suffered severe emotional distress, which manifested itself in numerous ways, including physical symptoms.

271.    The actions and inactions of BOP medical and correctional staff, including John Roe #1 and #2, constitute the tort of intentional infliction of emotional distress under Pennsylvania law.

272.    Under the Federal Tort Claims Act, Defendant United States of America is liable.

**SEVENTH CAUSE OF ACTION**
**Federal Tort Claims Act – Intentional Infliction of Emotional Distress –**
**Ginetta Bynum**
**(Against All Defendants)**

273.    Plaintiff repeats the preceding allegations as if fully set forth herein.

274.    The actions and inactions of BOP staff as described above with respect to Plaintiff Ginetta Bynum were outrageous and extreme.

275.    The actions and inactions of BOP staff were intended to cause Ms. Bynum emotional distress or were undertaken with reckless disregard of the fact that such distress would occur.

276.    As a result of the actions and inactions of BOP staff, Ms. Bynum suffered severe emotional distress, which manifested itself in numerous ways, including physical and psychological symptoms such as difficulty sleeping, weepiness, anxiety, and depression.

277.    The actions and inactions of BOP staff constitute the tort of intentional

infliction of emotional distress under Pennsylvania law.

278.    Under the Federal Tort Claims Act, Defendant United States of America is

liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as

follows:

1.    Compensatory relief in an amount to be decided at trial;

2.    Punitive damages as to the third cause of action against the Individual

Defendants;

3.    Reasonable attorneys' fees and costs;

4.    Directing other and further relief as the Court may deem just and proper,

together with attorneys' fees, interest, costs, and disbursements of this action.


Dated:      May 20, 2025


KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP

By: /s/ Jonathan H. Feinberg
Jonathan H. Feinberg
Attorney No. 88227
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
Nick Brustin*
Katie McCarthy*
Katherine Cion*
200 Varick St. Suite 800

New York, NY 10014
212-965-9081
nick@nsbhf.com
katie@nsbhf.com
kcion@nsbhf.com

KAUFMAN LIEB LEBOWITZ & FRICK LLP
Alison Frick*
Ray Durham*
18 E. 48th Street, Suite 802
New York, NY 10017
212-660-2332
africk@kllf-law.com
rdurham@kllf-law.com

LEVY FIRESTONE MUSE
Josh Levy*
Juliana Andonian*
900 17th St. NW, Suite 1200
Washington, DC 20006
202-261-6564
jandonian@levyfirestone.com,
jal@levyfirestone.com

*Applications for pro hac vice admission
forthcoming